## Wabash Railroad Co. v. J. B. Harris, Doing Business as J. B. Harris & Co.

1. COMMON CARRIERS—*Transportation to Places Beyond Their Lines.*—Without an agreement to that effect a railroad company is not bound to carry goods beyond its own line, but if it does so agree its common law liability extends to the place of destination. Its acceptance of goods marked to a place beyond its own line is to be construed *prima facie* as a contract on its part for transportation to that place.

2. SAME—*Acceptance of Goods Marked for Transportation to Points Beyond Their Lines.*—The implied contract to transport goods as marked, arising from an acceptance by a common carrier of goods marked for transportation to points beyond its line may be overcome by proof of a special agreement limiting the liability in this particular.

3. SAME—*Limitations in the Bill of Lading or Receipt.*—Where the limitation appears only in the bill of lading or receipt given to the shipper,

however clearly expressed, the mere fact of its acceptance without objection by the shipper is not conclusive of his assent to it. To bind him it must be shown that he accepted it with a full understanding on his part of the limitation, and intentionally assented to it.

**Memorandum.**—Action for damages for failure to deliver goods by a common carrier. In the Circuit Court of Champaign County, on appeal from justice court; the Hon. Francis M. Wright, Judge, presiding. Trial by jury; verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the May term, 1893, and affirmed. Opinion filed June 22, 1894.

*Plaintiff's instruction No. 1:*

If you believe from the evidence that the defendant company or its agents at Champaign knew said trees were to be shipped to Troy, Mo., and said agents undertook to ship the same to Troy within a certain time, to be there for delivery at a certain time, and that one box of said trees went astray and did not reach its destination until nine days after the time agreed, then the plaintiff was not bound to receive them; and if you further believe from the evidence they were of no value, the defendant would be liable for the value thereof.

*Defendant's instruction No. 9:*

The court instructs the jury that the plaintiff had no right to refuse to take the trees, if the proof shows that they were tendered to him or his agent at Troy, Mo., unless you can say from the evidence that the trees had no value. And if you believe from the evidence that the trees at the time of their arrival, as shown by the proof, had a value, then it would have been the duty of the plaintiff to have received the trees and made the best disposition of them that he could, by the use of reasonable efforts.

Geo. B. Burnett and Geo. S. Grover, attorneys for appellant.

J. L. Ray & Boggs, attorneys for appellee.

Mr. Justice Pleasants delivered the opinion of the Court.

This action was commenced July 21, 1892, by appellee against appellant before a justice of the peace and tried on appeal in the Circuit Court, resulting in a verdict and judgment for plaintiff for $166.58. Having failed to get a new trial, defendant took this appeal.

Appellee was carrying on a large nursery business at Champaign. On November 3, 1891, he there delivered to appellant for transportation three boxes of fruit and orna-

mental trees, consigned to himself at Troy, Missouri, a station on the St. Louis & Hannibal Railroad, which connects with that of appellant. He had informed appellant's agent that they were sold to customers about Troy who would be notified to call for them there on November 8th and requested him to look up and fix the time and route to meet that engagement. They arrived at Hannibal on the 6th and two of them at Troy on the 8th, but the third was somehow, not shown, delayed until the 17th. Appellee's traveling man employed to make delivery was there from the evening of the 7th until the afternoon of the 9th, when he was obliged to go to points in southern Illinois for a like purpose. While so there all the trees in the missing box were called for by parties representing themselves, respectively, as the purchasers, but none ever so called again. A local agent of appellee saw several of them shortly afterward, and told them that if the box arrived soon he would deliver at their places of residence, but each replied that he would not receive them, as an unfavorable change in the weather had taken place by which the ground was then frozen two or three inches. He wrote to appellee for instruction and was directed, in case they should arrive, to have nothing to do with them; of which he informed the railroad agent. The latter having so reported to appellant's agent at Champaign and asked what he should do, was directed to sell them for the most he could get; and having further reported that $10 was the best offer received, was further instructed to accept it, which he did. The aggregate amount for which they had been contracted by appellee was $183.85.

There is no material difference between counsel as to the law. The questions made are, what was the contract between the parties or the duty imposed upon appellant, who is liable for the loss upon the facts shown, and what is the measure of damages.

Appellee did not in person deliver the goods to appellant. They were sent by a drayman, who brought back its agent's receipt, in the usual printed form, with the blanks filled by

place and date of shipment, name of consignee, destination of the goods—which was " Troy, Mo."—and route, " via Hannibal." The printed part contained in fine type a statement of the company's agreement, " to transport with as reasonable dispatch as its general business will permit to destination, if on its road, or, otherwise, to the place on its road where same is to be delivered to any connecting carrier, and there deliver to the consignee, or to such connecting carrier," upon the terms and conditions set forth and stated to be " hereby agreed to by the shipper." They express quite a number of limitations of the carrier's liability, among which are one confining it to loss or damage occurring on its own line, and another fixing the time within which claims for loss must be presented and suits therefor brought. Here the loss or damage did not occur on its line, nor was the claim formally presented within the time.

Without an agreement to that effect, appellant was not bound to carry these goods beyond its own line, but if it did so agree, its common law liability extended to the place of destination. Its acceptance of them marked to " Troy, Mo.," should be construed, *prima facie*, as a contract on its part for transportation to that place. I. C. R. R. Co. v. Frankenberg, 54 Ill. 88; Field v. C. & R. I. R. R. Co., 71 Ill. 458; Erie Ry. Co. v. Wilcox, 84 Id. 239; W. St. L. & P. Ry. Co. v. Jaggerman, 115 Id. 407; C. & N. W. R. R. Co. v. Church, 12 App. 17. This implication from the marks and destination may, however, be overcome by proof of a special agreement, limiting the liability in this particular. The cases above cited, and others referred to in them, so hold. See also C. & N. W. Ry. Co. v. Chapman, 133 Ill. 96. But where the limitation appeared only in the bill of lading, or receipt given by the carrier to the shipper, for the goods delivered for transportation, however clearly expressed, the mere fact of its acceptance by the shipper without objection was never held conclusive of his assent to it. To bind him as by a contract it was necessary to show that he accepted it with a full understanding on his part of the condition or limitation and actually intended to assent to it; and these

were questions for the jury.   Anchor Line v. Dater, 68 Ill. 369; same case (as Erie & Western Tr. Co. v. Dater) in 91 Id. 195; C. & N. W. Ry. v. Montfort, 60 Id. 175; Adams Express Co. v. Haynes, 42 Id. 89.

There was no evidence tending to show an actual assent by appellee to this limitation beyond the mere fact of his acceptance of the receipt without objection, except that he knew the goods were to go by way of Hannibal, and that appellant's line terminated, as to their carriage, at that point.   The route was fixed by verbal arrangement with its agent two or three days before the receipt was accepted.   There is no pretense that in that arrangement any such limitation was agreed on or spoken of.   He testified, in chief, for defendant, "The exact conversation, *verbatim*, I don't remember;" and being then asked, "What was the substance of your talk with him as to where the Wabash R. R. Co. should take those goods," he answered, "We were to deliver them at Troy."   And further, that appellee telephoned him that the goods were to go to Troy, Mo., and desired that they be rushed through.   By his instructions to the agent of the St. Louis & Hannibal Co. after the box was reported missing, he showed the same understanding that their contract was for through transportation. Evidently appellee so understood, and hence made his claim against the Wabash Company.   The jury were therefore warranted in finding that he did not knowingly assent to the restriction expressed in the bill of lading, or "receipt," as it is commonly called where the carriage is by land. Hutchinson on Carriers, Sec. 120.   In C. & N. W. R. R. Co. v. Chapman, *supra*, it was said that the frequency of this question of actual and intentional assent, with the uncertainty of its determination, and consequently of the rights and liabilities of the parties, doubtless induced the passage of the act which made it unlawful for a railroad corporation to limit its common law liability safely to deliver property at the place to which it is to be transported, "by any stipulation or limitation expressed in the receipt given for the safe delivery of such property."   2 Starr & Curt., p.

1945 (R. S., Ch. 114, Sec. 33). This common law liability was to deliver safely within a reasonable time. Here the jury found that the property was not so delivered; and if the stipulation or limitation so expressed was not void under the statute, the evidence failed to show it was such a special contract on the part of appellee as would bind him notwithstanding the statute. And the jury further found, specially, that appellant waived the presentation or notice of his claim within the time stated in the receipt.

These findings seem to be supported by the evidence, and we hold they establish a right in appellee to recover.

But it is urged with earnestness that the instructions given by the court for the parties respectively are in direct and irreconcilable conflict, and that those given for the plaintiff lay down a very erroneous rule for the measurement of the damages, which was applied by the jury.

The first of the latter as stated in the abstract is slightly variant in phraseology from the record, and the law as therein stated is conceded in the one numbered nine and given for the defendant as asked, and substantially also in the first and tenth. Upon careful examination of the two series we perceive no material contradiction. They were given, as is usual, upon different theories of fact, that of plaintiff being that by unreasonable delay in transportation the goods were of no value to him when they arrived, and that defendant was informed, before it received them for transportation, that they had been sold, implying a certain sum as price, and were to be delivered to the purchasers, at Troy, on the day stated, and that of the defendant that they were only depreciated, and that something could have been realized from them by reasonable effort to that end. They presented questions for the jury, and each was claimed to be supported by evidence.

In substance the instructions were that upon the first the plaintiff was not bound to receive them and the defendant was liable for what would have been their value to plaintiff if they had arrived in good time, which was the price at which they had been sold; and upon the second, that he was

bound to receive them, whatever may have been the delay and consequent depreciation, and use all reasonable effort to get out of them their actual value, and that defendant would be liable only for the difference between what could have been so realized and what would have been their value to him if they had arrived in time. Of this difference appellee offered no proof whatever. Upon his theory he was not required nor could he consistently do so. He did make proof of the price at which he had sold them.

Was there any evidence tending to prove his claim that by reason of the delay they were of no value to him when they did arrive? He could not use them on his contracts. Those in the two boxes which came in time were all taken and paid for by the purchasers at the prices agreed on, while all of those delayed were absolutely refused, and only because of the delay. They had been packed for a carriage of five days in normal weather. They were out fourteen. After they were due, but before they came, the weather changed and the ground was frozen. Those who had wanted them, ordered them and stood ready to pay for them then, and for that reason declined to receive them.

Appellee, a nursery man of large experience and who knew how they were packed, delayed and exposed, thought the purchasers were justified in refusing to take them. If they who had so wanted them refused to take them, what reason had he to suppose that others might be induced to buy them notwithstanding his own judgment that the exposure must have unfitted them for use? He had no facilities for peddling them out, nor for heeling them in, storing or otherwise properly caring for them until it should be known whether and to what extent they had been injured, nor could he take them back to Champaign with a reasonable prospect of saving them, or realizing in any way more than the cost of disposing of them. In short they were then unmerchantable; had no market value. That it afterward turned out that many, or most, or nearly all of them, were not seriously injured, and by the care bestowed on them lived and thrived, is not material. The question is whether

there was reason to suppose at the time they arrived, that they were of any value. The railroad company sold them for ten dollars, the best offer received. That was no market price, but a mere risk, a chance taken at a venture by a party who had facilities for nursing and peddling them.

We think the circumstances afforded substantial evidence that to appellee they really had no value.

But if they had, appellant is in no condition to claim that it exceeded ten dollars. It was not bound to sell them as it did. The sale was therefore an appropriation of them, and the jury seem to have allowed appellee only the difference between what was realized on them and what they would have been worth to him if they had arrived in time, according to the rule contended for by appellant.

We are inclined to the opinion that justice was done and the judgment will therefore be affirmed.